# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARCUS DAIRY, INC. | : |
|     Plaintiff, | : |
| | : |
|       v. | :     Civil No. 3:05cv589 (PCD) |
| | : |
| ROLLIN DAIRY CORP. and, | : |
| CLOVER FARMS DAIRY COMPANY, | : |
|     Defendants. | : |

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Marcus Diary, Inc., brings this action alleging breach of a contract for the manufacture and delivery of milk, intentional misrepresentation, and a violation of the Connecticut Unfair Trade Practices Act. (Conn. Gen. Stat. § 42-110a *et. seq*.) Defendant Rollin Dairy Corp., brings counterclaims alleging breach of the covenant of good faith and fair dealing, breach of contract, and a violation of the Connecticut Unfair Trade Practices Act. (Conn. Gen. Stat. § 42-110a *et. seq*.) On October 8, 2007, Plaintiff moved for summary judgment [Doc. No. 155]. On October 8, 2007, Defendant filed a cross-motion for summary judgment [Doc. No. 159]. For the reasons stated herein, Plaintiff's motion is **granted in part and denied in part** and Defendant's motion is **granted in part and denied in part.**

## I.     Background

Plaintiff Marcus Dairy ("Marcus") has brought breach of contract, intentional misrepresentation, and Connecticut Unfair Trade Practices Act ("CUTPA") claims against Defendant, seeking damages plus costs and attorney's fees. (Amend. Compl.) [Doc. No. 140] Defendant Rollin Dairy Corp. ("Rollin") answered with eight affirmative defenses and filed

counterclaims asserting breach of good faith and fair dealing, breach of contract, and CUTPA violations. (Ans. to Amend. Compl.) [Doc. No. 153]  This case is currently before the court on Plaintiff's Motion for Summary Judgment with respect to its first cause of action (breach of contract) and all of Defendant's affirmative defenses and counterclaims, as well as Defendant's Motion for Summary Judgment with respect to all Plaintiff's claims and all Defendant's counterclaims, as to liability only.

Plaintiff is a Connecticut corporation and a licensed milk dealer in the State of New York. From 1996 through October, 2005, Plaintiff was engaged in the business of pasteurizing, processing, and packaging milk and milk products, and distributing those products in New York and Connecticut. (Amend. Compl. ¶¶ 1, 2.)  From 1996 through 2004, Plaintiff also engaged in the business of selling milk to retail customers in the State of New York. (Def.'s Rule 56(a)(2) Stmt. ¶¶ 3-8.)  Defendant is a New York corporation, doing business in New York.  From 1980 through the present, Defendant has engaged in the business of selling milk to retail customers in the State of New York, including the New York City Metropolitan Area and Long Island. (Id. at ¶¶ 14-19.)

On August 27th, 1996, Plaintiff and Defendant entered into a written supply agreement (Fitchett Aff. Ex. A. "1996 agreement") whereby Marcus agreed to "manufacture, package, and deliver 100% of Rollin's milk and dairy products." (1996 agreement ¶1.)  Although Defendant claims otherwise, the agreement clearly states that it is for a term of five years. (1996 agreement ¶2.)  The agreement required Marcus to deliver all products to Rollin's location in Farmingdale, New York on a refrigerated truck or trailer. (1996 agreement ¶1.)

2

The 1996 agreement contained a list of prices for the various milk and dairy products to be purchased by Rollin. (1996 agreement, schedule A.) The agreement provided that the prices set forth in schedule A would:

> ...fluctuate in accordance with prices paid to the farmer. This includes, but is not limited to, Federal Order Marketing Administration announcements, RCMA (Regional Commodity Marketing Association), The Dominant Regional Co-ops, Legislation, etc. The prices shall further fluctuate based on increases in cost pertaining to the product including but not limited to the cost of cartons and containers, labor, utilities, fuel, and the like. Verification of price changes shall be made to ROLLIN in writing within seven (7) days from the date upon which they shall become effective.

(1996 agreement ¶3.) According to Plaintiff, schedule A listed base prices for the milk products, that were to fluctuate in accordance with paragraph 3. (Pl.'s Rule 56(a)(1) Stmt. ¶29.) According to Defendant, schedule A listed prices in effect for the first month (Def.'s Local Rule 56(a)(2) Stmt. ¶ 25.) and prices thereafter would be set at Marcus' discretion.

The sale of milk is regulated by the Federal Government. The Federal Milk Market Administrator publishes the Federal Milk Marketing Order price ("FMO") on a monthly basis. (Fitchett Aff. ¶ 14; Mullery Dep. at 27.) The FMO price is the minimum price of milk that must be paid by milk processors to the farmer, and is therefore the first factor listed in paragraph 3 of the 1996 agreement. The FMO price is based upon a regulatory scheme which divides the United States into zones and sets the monthly price of milk in each zone. (Fitchett Aff. ¶15.) It is common for milk industry supply contracts to contain price adjustments based on the FMO. (Fitchett Aff. ¶ 16.)

The 1996 agreement did not require Plaintiff to sell milk only to Defendant. Between 1996 and 2001 Plaintiff continued to sell milk products to other distributors in the New York Metropolitan area, as well as distribute their own products. In 1999, Plaintiff began selling milk

to Raz Dairy ("Raz").  (Pl.'s Mem. of Law in Support of Summary Judgment at 4.)

During the term of the 1996 agreement, 1996-2001, Defendant's business expanded - from 25 to over 40 employees, from nine delivery routes making deliveries four to six days week to 15 delivery routes, almost all making deliveries six days a week.  (Gianella Dep. At 96-97.) Defendant's weekly purchases from Plaintiff grew from $60,000 per week to $130,000 per week. (Gianella Dep. at 54.)

Several times between 1996 and 2001, Defendant complained to Plaintiff of pricing and quality issues.  (Fitchett Aff. ¶ 22; Gianella Dep. at 77.)  In early 2001, Defendant received pricing information from other milk suppliers, and visited Clover Diary's plant. (Gianella Dep. at 58-68.)  However, Defendant decided to extend its current contract with Plaintiff.  In 2001, Defendant hired a consultant to help negotiate this extension. (Gianella Dep. at 64.)  On February 14, 2001, Plaintiff and Defendant entered into an amendment to the 1996 agreement, which extended the contract for another five-year term. ("2001 amendment" Fitchett. Aff. Ex. A.)

The 2001 amendment maintained most of the same terms as the 1996 agreement.  Under the amendment, however, Defendant would now have four weeks after delivery to pay for products received. (Id. ¶4a.)  The agreement also provided for a credit invoice to Defendant in the amount of $70,018.89 on the day the amendment took effect, as well as future credit invoices in February 2002 and 2003 equal to one week of average purchases by Defendant for the previous year. (Id. ¶4b.)  The amendment also contained a new schedule A (Id.)  With respect to their starting percentage over the FMO, the prices in the 2001 schedule A were lowered from the 1996 schedule. (Gianella Dep. at 73.)  The prices in the new schedule A were still to fluctuate in accordance with paragraph 3 of the 1996 agreement.  Neither the 1996 nor 2001 agreements

contained non-compete, exclusive territory, or "most favored nation" clauses.

From February 14, 2001 until December, 2004, Plaintiff supplied and delivered 100% of Defendant's milk and dairy products.  On July 7, 2002, July 10, 2002, July 20, 2002, September 8, 2003, March 4, 2004, and June 14, 2004, Defendant wrote Plaintiff complaint letters. Defendant informed Plaintiff that some of the delivered milk was spoiled or dirty and that its prices were not competitive.  Defendant claimed that it was having difficulty competing in the market due to its contract with Plaintiff. (Gallagher Aff. Ex. 24; 25; 26; 28; 29; 31.)  However, during this time, Defendant's business continued to grow.  Rollin's income increased from $13,864,988 in 2001 to $17,290,958.28 in 2004.  (Gianella Dep. At 100-02.)

On October 1, 2004, Defendant entered into a new five-year supply contract with Clover Farms. (Id. at 197.), which it planned to implement on December 10, 2004, when construction on Defendant's new, larger facility was to be completed. Defendant did not inform Plaintiff of its agreement with Clover Farms. (Gianella Dep. at 197.)  On December 7, 2004, Plaintiff received a letter from Defendant terminating their agreement as of December 10, 2004. (Pl.'s Mem. of Law in Support of Summary Judgment Ex. L.)

Plaintiff claims that this letter was a breach of contract and that as a result of Defendant's breach it suffered a huge loss in volume and was forced to close its milk processing plant in October, 2005.  (Fitchett Aff. ¶ 52.)  Plaintiff claims that it was ready, willing, and able to perform the contract and that Defendant breached the agreement without cause.  Plaintiff also contends that Defendant did not follow Plaintiff's credit policy, but unilaterally wrote off credits from its bills.  (Pl.'s Mem. of Law in Opp. to Summary Judgment at 28 citing Peck Dep.)

Plaintiff claims that it could not verify these write-offs because Defendant did not return such products. (Peck Dep. at 17-21.) Plaintiff alleges that Defendant did not return these products because they were not actually damaged but were intentionally false representations made to avoid payment for certain products. (Amend. Compl. ¶¶ 15-18.)

Defendant counters that Plaintiff breached the agreement by charging commercially unreasonable prices and supplying milk that was unfit for human consumption. (Ans. to Amend. Compl. ¶¶ 27-32.) Defendant specifically claims that Plaintiff engaged in discriminatory pricing, by charging lower prices to Raz and giving Raz favorable credit arrangements. Defendant contends that Plaintiff charged Raz 25 or 26 cents less per gallon of milk than it charged Defendant (Gianella Dep. at 85.) and gave Raz debt forgiveness not offered to Rollin. (Def.'s Rule 56(a)(1) Stmt. at ¶¶ 23-40.) Defendant asserts that Plaintiff gave Raz favorable treatment because Plaintiff and Raz had an anti-competitive agreement, including an agreement to "poach customers" from Defendant. (Def.'s Mem. of Law in Opp. to Summary Judgment at 20.) Defendant's expert found that of the four diary distributors he analyzed, Defendant paid the highest prices ("Foltz Report" at 1, 12, 13.), which were above the "going market price". (Id. at 2.)

Plaintiff answers that pricing in the dairy business varies for each customer and depends on many factors, including transportation costs, volume, packaging, product mix, credit terms, credit worthiness, rush orders, and guarantee of supply. (Fitchett Dep. at 74-77.) Plaintiff and their expert argue that these factors explain the difference between the invoice prices charged to Raz and Rollin. Plaintiff's expert asserts that when these factors are accounted for, Rollin actually received a better price than Raz. (Kosowsky Report I at 9.)

## II.     Standard of Review

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  (FED. R. CIV. P. 56(c).)  No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A material fact is one which "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  However, "[c]onclusory allegations will not suffice to create a genuine issue."  Delaware & H.R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990).

The initial burden falls on the moving party, who is required to "demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, the burden shifts to the party opposing summary judgment to set forth "specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  The non-moving party "may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that 'its version of the events is not wholly fanciful.'"  Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)).

The same legal standards apply when considering cross-motions for summary judgment.

A court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Make the Road by Walking, Inc. v. Turner, 378 F .3d 133, 142 (2d Cir. 2004) (citations omitted); see also Scholastic, Inc. v. Harris, 259 F.3d 73, 81 (2d Cir. 2001). A court must deny both parties' motions for summary judgment if it finds the existence of disputed material facts. Morales v. Quintel Entertainment, Inc., 249 F.3d 115, 121 (2d Cir. 2001). Therefore, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. at 121.

## III.    Discussion

### A.    Breach of Contract (Plaintiff's Count One, Defendant's Third, Seventh, and Eighth Affirmative Defenses and First and Second Counterclaims)

In count one of the amended complaint, Plaintiff claims that Defendant breached the contract by terminating the 2001 agreement. In its counterclaims for breach of contract (second counterclaim) and breach of the duty of good faith and fair dealing (first counterclaim), Defendant asserts that Plaintiff breached the agreement by charging commercially unreasonable prices and selling milk that was unfit for human consumption. Defendant makes these same allegations in its third, seventh, and eighth affirmative defenses. The court will deal with all of these claims together, as they arise from the same disputed factual issues. Simply put, Defendant claims that Plaintiff breached its duties of good faith and fair dealing (which includes charging commercially reasonable prices) under the law governing the contract, the UCC, and therefore breached the contract. Plaintiff claims that it performed its obligations under the contract and Defendant therefore breached by

terminating the agreement.  Therefore, it is unnecessary to separately address Defendant's various affirmative defenses alleging Plaintiff's breach of contract.

Plaintiff argues that summary judgment should be granted in its favor because there is no genuine issue of material fact as to whether Rollin improperly terminated the contract.  Defendant argues that summary judgment should be granted in its favor because there is no genuine issue of material fact as to whether Marcus breached the contract by charging commercially unreasonable prices.

### 1. UCC 2-305

"The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." Rosato v. Mascardo, 82 Conn. App. 396, 411 (Conn. App. 2004).  There is no dispute that the parties freely entered into both the 1996 agreement and 2001 amendment and that a contract was formed.  However, there is a genuine issue of material fact as to the element of performance.  The 1996 agreement and the 2001 amendment are governed by the provisions of Article 2 of the Uniform Commercial Code (adopted at Conn. Gen. Stat. § 42a-2-105(1). *et. seq*.)  Article 2 applies to contracts for the "present sale of goods" and "a contract to sell goods at a future time." (Conn. Gen. Stat. § 42a-2-105(1).)  The milk and related products at issue here are goods under the UCC.

In addition, the 2001 agreement is a contract for sale with an open price term and is therefore governed by Section 2-305 of the UCC (Conn. Gen. Stat.  § 42a-2-305.), which states:

> (1) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if (a) nothing is said as to price; or (b) the price is left to be agreed by the parties and they fail to agree; or (c) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.
> (2) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.

Plaintiff contends that the 1996 agreement and 2001 amendment do not contain open price terms. Plaintiff argues that it did not have sole discretion to set the price of the products it sold to Defendant, as paragraph 3 of the agreement was a mechanism for making adjustments to the starting prices in Schedule A. Plaintiff relies heavily on Dairyland Power Co-op v. Amax Inc., 700 F. Supp. 979, 991 (W.D. Wis. 1986), where the court held that "a contract that sets prices according to a detailed price adjustment mechanism tied to specific cost factors does not implicate the open price provisions of UCC § 2-305." However, the Dairyland price adjustment mechanism was much more detailed than paragraph 3 of the 1996 agreement. The contract at issue in Dairyland "provided a mechanism under which defendant can adjust the base price... section 7 describes a number of cost factors that are subject to adjustment and provides mathematical formulas for the readjustment of each factor." Id. at 982. In contrast, paragraph 3 of the 1996 agreement does not contain a mathematical formula. It only states:

> "prices...will fluctuate in accordance with prices paid to the farmer. This includes, but is not limited to, Federal Order Marketing Administration announcements, RCMA (Regional Commodity Marketing Association), The Dominant Regional Co-ops, Legislation, etc. The prices shall further fluctuate based on increases in cost pertaining to the product including but not limited to the cost of cartons and containers, labor, utilities, fuel, and the like."

(1996 agreement ¶3.) Although it sets out factors upon which price adjustments shall be made, it leaves Marcus discretion to weigh increases and decreases in prices paid to the farmer and other market indicators. Unlike in Dairyland, the 1996 agreement does not contain detail on how Marcus must use the factors in paragraph 3, let alone a mathematical formula.

Although Connecticut courts have not yet interpreted § 2-305 in a context similar to the case at hand, "Connecticut courts may look to decisional law from other states on Uniform Commercial

Code provisions in construing Connecticut's Uniform Commercial Code." <u>Mobile Homes by Delafield v. Doner</u>, 2007 Conn. Super. Lexis 436 at *9 (Conn. Super. Ct. Jan. 25, 2007).

In <u>Callahan v. Sunoco</u>, 2005 U.S. Dist. Lexis 7395 *1, *4-5 (E.D. Pa. 2005), the court found that although the contract at issue contained a mathematical formula for a recommended price, because the final prices "required pricing department employees to weigh all of the relevant factors" the contract contained an open price term and was therefore governed by UCC § 2-305.  The agreement at issue is similar.  Under the 1996 agreement, Marcus was to weigh the factors in paragraph 3, the factors relevant to milk price .  The price was not set automatically by a formula.  Similarly, in <u>Allapattah Services, Inc. v. Exxon Corp.</u>, 61 F. Supp.2d 1308, 1311 (S.D. Fla. 1999),  the court held that the price charged to the oil dealers was an "open price" because it was "intended to fluctuate based on a number of factors in effect when loading commenced or upon delivery."  The Sixth Circuit also found that under the UCC, a price term is open when it is set daily "based on a 'market basket' of pricing information." <u>Tom-Lin Enterprises. v. Sunoco, Inc.</u>, 349 F.3d 277, 279 (6th Cir. 2003).  Like the contract at issue here, the Sunoco contract in <u>Tom-Lin Enterprises</u> specified the 'market basket' that Sunoco was bound to base its pricing on, but the contract contained no mathematical formulas or detailed mechanism for determining the price.  Although Sunoco consistently set its price six to nine cents below the market basket, the court still found that Sunoco had discretion to determine its prices.

The agreement at issue here is similar to those held to have open price terms by other courts. Unlike the contract in <u>Dairyland</u>, the 1996 agreement and the 2001 amendment do not have a mathematical formula for setting prices.  Without such a formula, or other detailed mechanism, Marcus had discretion to weigh the factors listed in paragraph 3.   In <u>Tom-Lin</u> and <u>Allapath</u>, the courts found that lists of factors on which to base a price, without more, are open price terms.  In addition, in <u>Tom-</u>

Lin , the court further found that even if discretion is exercised to set a consistent price, § 2-305 applies.  Therefore, the contract at issue here has an open price term.

 As noted above, performance of contracts for the sale of goods with open price terms are governed by UCC §2-305.  Section 2-305 (2) provides that "a price to be fixed by the seller or by the buyer means a price for him to fix in good faith." (Conn. Gen. Stat. § 42a-2-305(2).)  The requirement of "good faith includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant." (UCC § 2-305, Comment 3.)  Therefore, performance of the contract at issue includes the setting of commercially reasonable prices.

Defendant claims that Plaintiff bears the burden on this issue and must produce expert evidence to prove its good faith and the commercial reasonableness of the prices it set.  However, as the court has previously stated, the "party attempting to prove such that another party breached a covenant of good faith and fair dealing by setting a commercially unreasonable price in violation of UCC § 2-305 'must produce some evidence of improper motive, discriminatory pricing, or the pricing practices of other franchisees.'" (Ruling Granting Motion to Compel dated March 9, 2006 [Doc. No. 52] quoting Yonaty v. Amerada Hess Corp., 2005 U.S. Dist. Lexis 22429 at *17 (N.D.N.Y. 2005)).  Defendant therefore bears the burden on this issue.

Defendant alleges that Plaintiff had improper, anti-competitive motives and an anti-competitive agreement with Raz. (Def.'s Mem. of Law in Opp. to Summary Judgment at 20.)  Courts are split as to whether motivation in price setting is relevant for purposes of § 2-305.  The majority of courts have held that subjective bad faith is irrelevant and UCC §2-305 "only requires that a seller charge 'commercially reasonable' amounts unless it 'used pricing to discriminate among its purchasers.'" Bob's Shell, Inc. v. O'Connell Oil Assoc., 2005 U.S. Dist. Lexis 21318 at *13 (D. Mass. 2005)

(quoting Shell Oil v. HRN, Inc., 144 S.W. 429, 434 (Tex. 2004)). Some courts, however, have found that even if the price was commercially reasonable, a lack of subjective, honesty-in-fact good faith can amount to a violation of § 2-305. See Bob's Shell, Inc. v. O'Connell Oil Assoc., 2005 U.S. Dist. Lexis 21318 at *14 (D. Mass. 2005); Mathis v. Exxon Corp., 302 F.3d 448 (5th Cir. 2002). The court finds it unnecessary to address this debate here, as Plaintiff denies the allegations above and Defendant's assertions of subjective bad faith have little support the record. (See Pl.'s Rule 52(a)(2) Stmt. ¶52; Zastenik Dep. at 52-54; Fitchett Aff. at ¶¶ 45-47.) The only evidence of an anti-competitive motive that Defendant can point to is a note that Plaintiff's owner, Jeffery Marcus, wrote on a list of Defendant's accounts. The note said "potential new customers" (Gallagher Opp. Aff. Ex. 4), but Marcus asserts that this note was written after Rollin terminated the agreement (Fitchett Aff. at 148.) Edward Zasternik of Raz Dairy corroborates Plaintiff's denial of any anti-competitive agreement. (Zasternik Dep. at 55.) Here, since Defendant's claim of discriminatory pricing has more weight than its claim of subjective bad faith, it is unnecessary to decide whether subjective bad faith alone can constitute a violation of § 2-305.

However, discriminatory pricing clearly is a violation of § 2-305(2). "It is abundantly clear...that the chief concern of the UCC Drafting Committee in adopting § 2-305(2) was to prevent discriminatory pricing - i.e., to prevent suppliers from charging two buyers with identical pricing provisions in their respective contracts different prices for arbitrary or discriminatory reasons." Shell Oil Co. v. HRN Inc., 144 S.W.3d 429, 435 (Tex. 2004) quoting Wayman v. Amoco Oil Co., 923 F. Supp. 1322, 1346-47 (D. Kan. 1996) aff'd mem. 145 F.3d 283, 290-91. Defendant contends that Plaintiff violated its duty under UCC § 2-305 by giving more favorable credit terms and lower prices to Raz than to Rollin.

Defendant claims that Marcus Dairy charged Raz 25 or 26 cents less per gallon than it charged Defendant. (Gianella Dep. at 85.) Defendant further argues that Marcus gave very favorable credit terms to Raz, especially by providing Raz with substantial debt forgiveness on a $907,000 debt (Def.'s Rule 56(a)(1) Stmt. at ¶¶23-409; Fitchett Dep. at 178.) Defendant claims that Marcus reduced Raz's debt by $300,000 (Def.'s Rule 56(a)(1) Stmt. at ¶¶24-33.) Defendant also points to the June 24, 2003 agreement between Marcus and Raz in which Marcus promised to credit Raz $125.00 for each trailer and amortize Raz's remaining $600,000 debt if Raz purchased a minimum of 40,000 gallons of milk and related products each week from Marcus. (June 24, 2003 agreement Gallagher Aff. Ex. 15.) Defendant further argues that Marcus continued to provide additional credits to Raz throughout 2004 and 2005. (Def.'s Rule 56(a)(1) Stmt. at ¶¶ 28, 35-40). Defendant submits that in comparison, between 2001 and 2004, it received credits of only $360,000 from Marcus (Gianella Dep. at 79-80.) and was not permitted to accumulate any substantial unpaid debt. (Def.'s Rule 56(a)(2) Stmt. ¶ 13; Promissory Note, Gallagher Aff Ex. 11.)

However, Plaintiff counters, and Defendant admits, that the pricing of milk is individualized. Suppliers in the dairy business do not charge all distributors the same price. (Gianella Dep. at 197-207.) Plaintiff explains that pricing in the dairy business depends on many factors, including transportation costs, volume, packaging, product mix, credit terms, credit worthiness, standard versus rush orders, plant capacity, and guarantee of supply. (Fitchett Dep. at 74-77; Mullery Dep. at 79-81; Valentine Dep. at 69-70.) Plaintiff asserts that the difference between the prices stated on Rollin's and Raz's invoices are due to these factors. According to Plaintiff, Marcus delivered milk to Rollin but Raz picked up its milk (Gianella Dep. at 85-86), Raz ordered a smaller variety of products than Rollin, Marcus did not guarantee a supply to Raz as it did to Rollin (Fitchett Dep. at 169), Marcus gave Rollin

a six-cent rebate per gallon on whole milk that it did not give to Raz (Fitchett Aff. ¶ 27),  Raz had a standard order and did not submit rush orders, and Raz paid cash on delivery for milk and milk products. (Id. ¶¶ 53-57.)  Plaintiff also claims that it gave credits, free weeks, and rebates totaling $898,157.94 off of the list prices to Rollin.  (Pl.'s Rule(a)(1) Stmt. ¶ 83.)  Plaintiff's expert argues that these factors explain the difference between the prices charged to Raz and Rollin. ("Kosowsky Report" I at 9.) Plaintiff asserts that when differences between Rollin and Raz are accounted for, Rollin actually received a better price.

Furthermore, under § 2-305(2), prices must be commercially reasonable.  However, "a jury may not decide in a vacuum whether a particular price for a particular item in a particular industry is appropriate....it was incumbent on [the claimant] to prove that the prices he paid...even if they were higher than what others in the same situation paid for the same product, were illegal." Schwartz. v. Sun Co., Inc., 276 F.3d 900 (6th Cir. 2002) (holding that plaintiff did not establish his prima facie case because he did not give evidence of the commercial reasonableness of the price.)  To determine if a price is commercially reasonablem it must be compared to the range of other prices in the market.  See Shell Oil Co. v. HRN Inc., 144 S.W.3d 429, 431-35 (Tex. 2004) ("a commercially reasonable price is one within the range of prices charged by other refiners in the market, absent some evidence that the refiner used pricing to discriminate among purchasers.") Furthermore, "commercial standards...should be established by expert testimony." Brasher's Cascade Auto Auction v. Valley Auto Sales & Leasing, 119 Ca. App. 4th 1038, 1069 (Cal. Ct. App. 2004).

While both parties have submitted expert reports, neither party's report adequately addressed the range of prices in the market.  Plaintiff's expert has shown that the monthly changes in the price it charged Defendant followed the FMO to 97% (Kosowsky Report I at 132.), meaning they retained

very close to the same margin above the FMO as the prices in the 2001 schedule A. (Kosowsky Report II Ex. 1a-1c.) However, the Kosowsky Report did not compare the price that Marcus charged Rollin to the range of other prices in the market.

Defendant's expert reports that Rollin paid the highest prices of the four dealers he analyzed. ("Foltz Report" at 1, 12, 13.) The Foltz Report found that Defendant was charged between eleven and seventeen cents per gallon above the "going market price." (Id. at 2.) However, to come to this conclusion, the Foltz Report used the lowest price of the four examined as the 'market price.' (Id. at 3.) Furthermore, in clarifying the meaning of a commercially reasonable price, the Texas Supreme Court noted that it is not the same as a fair market price or the lowest price available. Shell Oil Co. v. HRN Inc., 144 S.W. 3d 429, 437 (Tex. 2004). Therefore, that Defendant paid the highest prices of the four competitors does not by itself prove that the price was "commercially unreasonable." In addition, the Kosowsky Report contends that the Foltz Report is not reliable because it failed to control for any of variables that affect price, besides transportation. (Kosowsky Report I at 10.) Plaintiff also argues that the four examples Foltz used did not adequately represent the entire range of market prices.

Furthermore, Defendant's business grew substantially from 2001 to 2004 (Gianella Dep. at 95-97, 100-104), which tends to show that Defendant was adequately able to compete, contrary to the assertion that it was charged unreasonable prices for the products it sold. However, Defendant counters that the growth in its business was due to "the fact that we sold many items in addition to milk. We sold soda, water, juice, yogurt, butter, eggs." (Gianella Aff. ¶ 42.)

In light of the facts discussed above, Defendant raises a credible claim under UCC § 2-305 and Plaintiff counters with credible explanations and defenses. Whether the differences in price and credit terms are discriminatory or are adequately explained by the nature of the milk market, including the

factors cited by Plaintiff, are disputed material facts. "The evidence is such that a reasonable jury could return a verdict for [either] party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1996). Neither party has met the "the difficult burden of demonstrating that the there is no evidence in the record upon which a reasonable fact finder could base a verdict in the [other party's] favor. Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005).

### 2. Goods Unfit for Human Consumption

Defendant claims that Plaintiff breached the contract by providing Rollin with spoiled milk, unfit for human consumption. (Ans. to Amend. Compl. ¶32; Def.'s Rule 56(a)(1) Stmt. ¶¶ 53-55.) Plaintiff admits that Defendant periodically complained about quality. (Fitchett Aff. ¶22.) However, Plaintiff asserts that these complaints were misrepresentations. (Amend. Compl. ¶¶15-18). Plaintiff claims that Defendant did not return the milk it reported spoiled, and unilaterally took deductions off its bill for spoiled milk that could not be substantiated. (See O'Reilly Dep. 102-103.) Since neither party has been able to substantiate their claims on this issue, these competing contentions involve questions of credibility. "[S]ummary judgment under Rule 56 ... may not be invoked where, as here, the [depositions of the principal witnesses] present conflicting versions of the facts which require credibility determinations." Davis v. Zahradnick, 600 F.2d 458, 460 (4th Cir.1979) (per curiam); see also Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir.1986).


Therefore, as to Count One of the Amended Complaint and Defendant's First and Second Counterclaims, and Defendant's Third, Seventh, and Eighth Affirmative Defenses, Plaintiff's Motion for Summary Judgment is **denied.** As to Count One of the Amended Complaint and Defendant's First and Second Counterclaims, Defendant's Motion for Summary Judgement is **denied**.

**B.     Unclean Hands and Unconscionability (First and Sixth Affirmative Defense)**

**1.  Unconscionability**

Defendant claims that the contract is unconscionable because it leaves the pricing of products to the "sole discretion of Plaintiff." (Ans. to Amend. Compl. at 5.) "A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made - i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." Hottle v. BDO Seidman LLP, 846 A.2d 862, 878-89 (Conn. 2004). Procedural unconscionability is judged by whether the party seeking to enforce the contract used high pressure tactics or deceptive language or there was an inequality of bargaining power. Id.

Here, Defendant does not claim that the contract was signed under such condidtions. (Gianella Dep. at 53.) Both parties were sophisticated informed merchants in the same trade. Before signing the 2001 amendment, Defendant received pricing from several other suppliers but chose to maintain its relationship with Plaintiff. (Gianella Dep. at 59.) Furthermore, Defendant's president hired a professional consultant to advise him in negotiating the amendment. (Gianella Dep. at 64.) The language of the contract is clear, not deceptive. The contract is clearly not procedurally unconscionable.

In addition, the contract is not substantively unconscionable. The structure of the contract is common to the industry. (Mullery Dep. at 96.) There is nothing inherently unconscionable about a contract that leaves pricing to the discretion of one party. As discussed in the previous section, Section 2-305 of the UCC (Conn. Gen. Stat. § 42a-2-305.) allows open price terms, requiring the party with discretion to set the price in good faith. Furthermore, the 2001 amendment, the contract at issue,

contains the same discretionary pricing structure as the 1996 agreement. If Defendant's president and owner truly felt that a contract with discretion was unconscionable, he should not have chosen to extend the 1996 agreement.

Therefore, because there is no material issue of fact as to this count, Plaintiff's Motion for Summary Judgment as to Defendant's Sixth Affirmative Defense of unconscionability is **granted.**

### 2. Unclean Hands

Defendant asserts that if unconscionable conduct is found, a party cannot seek equitable relief. See Monetary Funding Group, Inc. v. Pluchino, 87 Conn. App. 401 (Conn. App. 2005). However, this court has granted Plaintiff summary judgement on Defendant's Affirmative Defense of Unconscionability.

Furthermore, even in the light most favorable to Defendant, there is no issue of material fact as to whether Plaintiff's conduct was so "unfair, inequitable, or dishonest" Id; see also Thompson v. Orcutt, 257 Conn. 301 (Conn. 2001), as to bar Marcus from bringing claims in court. Unclean hands are usually found where a Plaintiff was dishonest or took advantage of the other party. Defendant has not alleged any such facts in this case. Even if a trier of fact found that the prices charged by Plaintiff were commercially unreasonable, that would not rise to the level of conduct necessary to invoke the doctrine of unclean hands. Defendant has not alleged that Plaintiff was hiding profits, charging Plaintiff for goods not delivered, or taking advantage of an uninformed Defendant. See Id.; Monetary Funding Group, Inc. v. Pluchino, 87 Conn. App. 401, (Conn. App. 2005). Therefore, because there is no material issue of fact as to this count, Plaintiff's Motion for Summary Judgement as to Defendant's First Affirmative Defense of unclean hands is **granted.**

### C. Accord and Satisfaction (Second and Fourth Affirmative Defenses)

Defendant also asserts the affirmative defense of accord and satisfaction. "When there is a good faith dispute about the existence of a debt or about the amount that is owed, the common law authorizes the debtor and the creditor to negotiate a contract of accord to settle the outstanding claim." Herbert S. Newman and Partners, P.C. v. CFC Const. Ltd. Partnership, 236 Conn. 750, 765 (Conn. 1996). "Satisfaction takes place when the accord is executed." Id. If there is a good faith dispute about the existence or amount of a debt, and a party sends a check marked "final payment," "payment in full," or "in full satisfaction" then, by indorsing and depositing the check, the payee accepts the check as an accord and satisfaction. County Fire Door Corp., v. C.F. Wooding Co., 202 Conn. 277, 279-80 (Conn. 1987).

Here, Defendant claims that an accord and satisfaction was reached because it sent checks to pay, in full, invoices from Plaintiff totaling over $1,000,000 after terminating the agreement. (Def.'s Mem. of Law in Opp. to Summary Judgment at 25.) However, there is no issue of material fact as to whether these checks constituted an accord and satisfaction of Plaintiff's breach of contract claim. Plaintiff and Defendant did not have a dispute concerning invoices; their dispute concerned the termination of the contract. The invoices were not a disputed debt. They were for milk delivered before the termination of the contract, an issue separate and apart from the dispute between the parties concerning whether the termination of the agreement was proper. Furthermore, the checks were not marked "paid in full" or with any of the other phrases necessary for a cashed check to become an accord and satisfaction. (Pl.'s Mem. of Law in Support of Summary Judgment, Ex. O.)

For these reasons, Plaintiff's Motion for Summary Judgment as to Defendant's Second and Fourth Affirmative Defenses is **granted.**

### D.    Failure to Mitigate Damages (**Fifth Affirmative Defense**)

As an affirmative defense, Defendant claims that Plaintiff failed to mitigate its damages. Plaintiff counters that it need not mitigate damages because it is a lost volume seller. "A lost volume seller cannot possibly mitigate damages" New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc., 2002 U.S. Dist. Lexis 2596 at *42-43 (D. Conn. 2002), because theoretically, a lost volume seller would have generated a second sale irrespective of the buyer's breach. "The majority of both courts and commentators have recognized the illegitimacy of the mitigation argument" as it pertains to lost volume sellers. Id.

However, to prove that it is a lost volume seller, the non-breaching party must show: "[1] that the seller of services had the capability to perform both contracts simultaneously; [2] that the second contract would have been profitable; and [3] that the seller of services probably would have entered into the second contract even if the first contract had not terminated." Gianetta v. Norwalk Hosp., 266 Conn. 544, 553-554 (Conn. 2003). Generally, whether a Plaintiff is a lost volume seller is a question of fact. New England Diaries, Inc. v. Diary Mart Convenience Stores, Inc., 2002 U.S. Dist. Lexis 2596 at * 31 (D. Conn. 2002). A merchant can be a lost volume seller even if its capacity is not unlimited, if it had the capacity to enter into another supply contract at the time of the breach. Id. at *33. Here, Plaintiff probably had such capacity, as it had excess capacity at its plant during the time period it supplied Defendant. (Pl.'s Rule 56(a)(1) Stmt. ¶ 130.) However, the doctrine of a lost volume seller is usually applied when the seller re-sold the goods through a second contract. Here, since there was no second contract, and Marcus was unable to re-sell the goods, whether a theoretical second contract would have been profitable is a difficult question of fact. The parties dispute this question (Def.'s Mem. of Law in Opp. to Summary Judgement at 29.) but have offered little evidence.

Furthermore, because Plaintiff was unable to find a second contract, this would be an unusual

application of the doctrine of a lost volume seller.  Therefore, whether or not Marcus tried to find

substitutes to mitigate damages is probably a more relevant question than whether a theoretical second

contract would have been profitable. Plaintiff has given some indication that it did try to mitigate

damages, but has not adequately substantiated this assertion in the record. (Fitchett Aff. ¶¶46,49.)

Because this issue involves questions of disputed fact, and Plaintiff has not met "the difficult

burden of demonstrating that the there is no evidence in the record upon which a reasonable fact finder

could base a verdict in the [other party's] favor, <u>Jeffreys v. City of New York</u>, 426 F.3d 549, 554 (2d

Cir. 2005),  Plaintiff's Motion for Summary Judgment as to Defendant's Fifth Affirmative defense is

**denied.**


### E. Defendant's CUTPA Claim (Third Counterclaim)

Defendant asserts a claim under the Connecticut Unfair Trade Practices Act  ("CUTPA")(

Conn. Gen. Stat. § 42-110a *et. seq*.).  Plaintiff argues that CUTPA is inapplicable because Defendant

is a New York Corporation and therefore any injuries occurred in New York.  However, CUTPA "does

not necessarily require that the violation occur within the state, only that it be tied to a form of trade

of commerce intimately associated with Connecticut." <u>H & D Wireless Limited P'ship v. Sunspot</u>,

Civil No. H-86-1026 (D. Conn. Feb. 24, 1987) (abstracted at 13 Conn. L. Trib. No. 17 at 22)(Dorsey,

J.).  Plaintiff is a Connecticut corporation**,** and therefore  its actions, especially price setting which

occurs at headquarters, are "intimately associated with Connecticut."  Furthermore, a Connecticut

corporation should expect its trade practices to be subject to CUTPA.  <u>See Id</u>.

Plaintiff also asserts that Defendant's CUTPA claim is barred by the statute's three-year

limitation provision.  (Conn. Gen. Stat. § 42-110g(f).)  However, Defendant alleges violations based

not upon the signing of the 2001 amendment, but upon a course of conduct that continued through the termination of the contract in December, 2004. Defendant alleges that Plaintiff continuously discriminated against Defendant and engaged in anti-competitive practices between 2001 and 2004, breaching its continuing duties under the contract. "It is axiomatic that when the wrong sued upon consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed." Bellmare v. Wachovia Mortgage Corporation, 94 Conn. App. 593, 608 (Conn. App. Ct. 2006)[citations omitted]. Therefore, Defendant's CUTPA claim will be evaluated on the merits.

Conduct is actionable under CUTPA if it either "1) offends public policy, 2) is immoral, unethical, oppressive, or unscrupulous, or 3) causes substantial injury to consumers, competitors or other business[men]." Johnson Electric Co., Inc. v. Salce Contracting Assoc., Inc. 72 Conn. App. 342, 356 (Conn. App. Ct. 2002); Scotland Yard Assoc. v. Manufacturer/Traders, 1999 Conn. Super. Lexis 1708 (Conn. Super. Ct. 1999). The misconduct must demonstrate unfairness to a substantial degree. See Id.

In alleging a violation of CUTPA, Defendant asserts the same factual claims - i.e. that Plaintiff overcharged Defendant, engaged in discriminatory credit and pricing practices, and engaged in an anti-competitive agreement with Raz - that it asserted for its first and second counterclaims discussed above in section III(A)(1). If proven, these allegations would amount to a violation of CUTPA. Price discrimination between substantially similar customers is "unethical, oppressive, and unscrupulous" Id. and is an unfair trade practice.

However, in response, Plaintiff asserts the same explanations for the difference in its list prices for Rollin and Raz that were discussed in section III(A)(1). Plaintiff offered the same evidence tending to support its assertions that it charged Defendant reasonable prices and did not have improper motives

as was discussed above in section III(A)(1).

Defendant's CUTPA claim involves the same questions of fact discussed with respect to Defendant's breach of contract and breach of good faith claims, and as previously concluded there are genuine questions of material fact as to these issues. For this reason, Plaintiff's Motion for Summary Judgement as to Defendant's Third Counterclaim is **denied** and Defendant's Motion for Summary Judgment as to Defendant's Third Couterclaim is **denied.**

### F. Plaintiff's Intentional Misrepresentation and CUTPA claim (Counts Three and Two)

#### 1. Intentional Misrepresentation

Plaintiff alleges that Defendant made intentionally false representations that products Plaintiff supplied were damaged so that Defendant could obtain product credits. (Amend. Compl. ¶¶15-18.) An action for intentional misrepresentation requires proof of four elements: "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did act upon that false representation to his injury." Cox v. Bland, 2006 U.S. Dist. Lexis 80624, at *13-14 (D. Conn. Oct. 27, 2006) quoting Suffield Associates Limited Partnership v. National Loan Investors, L.P., 64 Conn. App. 192, 202 ( Conn. App. 2001).

Plaintiff's operations manager described Plaintiff's product credit policy. To obtain credit for a product, distributors were supposed to physically return the unfit product to Plaintiff. (Peck Dep. at 17.) Plaintiff's general manager testified that Defendant did not adhere to this requirement. (Fitchett Dep. at 124-127.) Plaintiff claims that Defendant unilaterally took credits without returning the product, "leaving Plaintiff with no way to verify that such product, was in fact, damaged or bad." (Pl.'s Mem. of Law. in Opp. to Summary Judgement at 28 citing Peck Dep. at 20-21.) Plaintiff was unable

to match the amounts that Defendant deducted from its bill with returned products and thereby verify Defendant's claims that certain products were unfit. (O'Reilly Dep. at 63,69,94; Fitchett Dep. at 122-23.) General Manager Fitchett further testified that "he believed that Rollin knowingly took credits for items that he did not have a good faith basis to believe he was entitled to take credit for." (Pl.'s Mem. of Law in Opp. to Summary Judgement at 26 <u>citing</u> Fitchett Dep. at 124-127.) Plaintiff's operations manager also opined that if a claim cannot be verified, "it's a false claim." (Peck. Dep. at 39.)

Even taking these facts in the light most favorable to Plaintiff, the non-moving party, they are insufficient to raise a question of material fact. Even if Defendant did not follow Plaintiff's credit policy and took credits without returning the products, Plaintiff has failed to provide any evidence supporting element two of an intentional misrepresentation claim, which requires that the statement] was untrue and was known to be untrue by the party making it. Plaintiff's only evidence that the goods were not unfit and that Defendant was making an intentional misrepresentation in claiming a credit for them is the subjective belief of Plaintiff's employees. The unsupported conjecture of Plaintiff's employees is a "conclusory allegation" that cannot survive summary judgment. <u>Morris v. Lindau,</u> 196 F.3d 102, 109 (2d Cir. 1999). Without evidence of Defendant's intent to make false statements, or more than conclusory allegations that Defendant's statements were actually false, a violation of a credit policy does not amount to intentional misrepresentation.

For the reasons stated herein, Defendant's motion for summary judgment as to Plaintiff's count three is **granted.**

### 2. Plaintiff's CUTPA claim (Count Two)

"Plaintiff's CUTPA claim is premised on the same factual allegations as [its] intentional misrepresentation claim." (Pl. Mem. of Law in Opp. to Summary Judgment at 28.) Therefore, for the

reasons discussed with regards to that claim, Plaintiff's CUTPA claim cannot survive Defendant's motion for summary judgment. For the reasons stated herein, Defendant's motion for summary judgment as to Plaintiff's count two is **granted.**

## IV.    Conclusion

For the reasons stated herein, Plaintiff's motion for summary judgment [Doc. No. 155] is **granted in part and denied in part**.   Defendant's cross-motion for summary judgment [Doc. No. 159] is **granted in part and denied in part.**

In sum, the case will move forward on Plaintiff's remaining claim for Breach of Contract. Defendant's remaining defenses are breach of an obligation to sell milk at commercially reasonable prices, breach of agreement by price discrimination, breach of agreement for selling unfit goods, and failure to mitigate damages. The case will also move forward on Defendant's remaining claims for Breach of the Covenant of Good Faith and Fair Dealing, Breach of Contract, and a CUTPA violation.


            SO ORDERED.
                            Dated at New Haven, Connecticut, September  23 , 2008.


                            _____/s/_____
                            Peter C. Dorsey, U.S.D.J.